FREDERICK W. BAUER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bauer v. Commissioner
Docket No. 18477-83.
United States Tax Court
T.C. Memo 1987-190; 1987 Tax Ct. Memo LEXIS 183; 53 T.C.M. (CCH) 571; T.C.M. (RIA) 87190; April 9, 1987. *183 Held: (1) The Commissioner's determination of deficiencies for 1978, 1979, and 1980 through means of net worth computations is sustained, as modified herein. (2) P is not liable for the addition to tax for fraud under sec. 6653(b), I.R.C. 1954. (3) P is liable for the addition to tax for underpayment of estimated tax pursuant to sec. 6654, I.R.C. 1954, for 1980. Judy Potter, for the petitioner. Christine Colley, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in, and additions to, the petitioner's Federal income taxes: Additions to Tax
Sec. 6653(b)
Sec. 6654
Year
Deficiency
I.R.C. 1954 [1]
I.R.C. 1954
1978
$3,695.28
$1,847.64
1979
9,589.77
4,794.88
1980
89,050.38
44,525.19
$5,616.47
The issues for decision are: (1) Whether the petitioner understated his taxable income for each of the years 1978, 1979, and 1980, in the amounts determined by the Commissioner by means of the net worth method of reconstruction of income; (2) whether the petitioner is liable for the addition to tax for fraud under the provisions of section 6653(b) for each of such years; and (3) whether the petitioner is liable for the addition to *184 tax for underpayment of estimated tax pursuant to section 6654 for 1980. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioner, Frederick W. Bauer, resided in Durand, Wisconsin, at the time his petition in this case was filed. The petitioner filed his Federal income tax returns for 1978 and 1979 with the Internal Revenue Service Center, Kansas City, Missouri, and his return for 1980 with the Internal Revenue Service Center, Ogden, Utah. The petitioner attended college at the University of Wisconsin, majoring in business administration, until he was drafted in 1968. While in college, he received his private pilot's license. At the time of trial, he had several advanced pilot's licenses and aircraft-type ratings. He served in the United States Navy for 4 years, where he was an air crewman in a squadron which transported VIPs, high priority cargo, and top secret information. During his service, the petitioner was stationed in Asia and the Pacific for 3-1/2 years. Wayne Shehan [2] was in the petitioner's Navy aircrew in Asia and the *185 Pacific. While the petitioner was in the Navy, he purchased a number of items, including stereo equipment, camera equipment, and three motorcycles, [3] and prior to returning to the United States, he stored such items and other possessions at Mr. Shehan's house in the Philippines. At the end of his tour of duty in Asia, the petitioner's property was packed, processed by customs, and shipped to the United States. [4] When the petitioner and his property were in the United States, Steven Weiss assisted the petitioner with unpacking. In 1978 and 1979, Mr. Weiss sold these assets for about $8,000 and kept a 10-percent commission. During 1976 through 1979, the petitioner worked, most of the time, for the George *186 S. May International Company (May). While with May, he was an executive analyst. The position required a great deal of travel and consisted of analyzing companies and making recommendations on how to increase their profits. For approximately 6 months, the petitioner worked for a New York real estate firm evaluating proposed real estate projects to determine whether they would be profitable. While working at the real estate firm, he attended business classes at New York University. From February 1980 until July 1982, the petitioner worked for David Smith. Mr. Shehan also worked for Mr. Smith from March 1978 until Mr. Smith's death, apparently by suicide, in July 1982. Mr. Smith, the inventor of the biorhythm calculator, was a speculator; he owned investment companies, courses for teaching Japanese and English languages, the Candler Building in Atlanta, Georgia (together with a former Governor of Georgia), the Atsugi School of Learning, and numerous other investments. Mr. Smith also owned a large farm near Atlanta, private airplanes, and at least seven boats. The petitioner testified that he was hired to advise and assist Mr. Smith in his investment activities; he analyzed various *187 properties and other investment opportunities for Mr. Smith and his associates. The petitioner was paid as an independent contractor, initially by check and later, allegedly because of bankruptcy proceedings against Mr. Smith, in cash. In 1980, Dross Metals, Incorporated (DMI), was a buyer and seller of used aircraft. [5] Located in Tucson, Arizona, DMI purchased surplus aircraft from the United States Government and refurbished and sold them as aircraft or cannibalized them and sold them as useful parts and scrap metal. At the time of trial, Howard Oseran, an attorney in Arizona, was the president of DMI. In May 1980, DMI, represented by Mr. Oseran, sold a C-119 airplane to Raven International Incorporated (Raven), represented by the petitioner. [6] The purchase price of such airplane was $45,000: $25,000 in a cashier's check (the remitter of which was Robert C. Chambers, identified as the escrow agent for Raven) and the remainder by a wire transfer. In such month, Raven purchased $2,500 worth of airplane parts. On *188 July 20, 1980, Mr. Chambers, identifying himself as an incorporator of Raven, filed an aircraft registration application for the airplane with the Federal Aviation Administration (FAA). On November 2, 1980, the petitioner, identifying himself as the agent of Raven, filed an application for an airworthiness certificate for the airplane with the FAA. In March 1982, such airplane was allegedly repossessed by DMI as payment for approximately $30,000 worth of repairs. Such repairs were requested by the petitioner, and such repossession of the airplane in lieu of cash payment was negotiated by the petitioner. In early 1980, the petitioner purchased a one-half interest in a commercial fishing boat located in Tampa, Florida. The total purchase price of such boat was $155,000. Craig L. Dill and the petitioner were equal partners in purchasing such boat. The entire price was paid in cash, primarily $20, $50, and $100 bills. After such purchase, the petitioner had contact with an insurance company concerning boat insurance. As part of his preparation for this case, the *189 petitioner contacted the United States Coast Guard in Florida. The Coast Guard sent him a "Consolidated Certificate of Enrollment and License" which stated that the Coast Guard could not find the boat or its owner. On December 4, 1980, the petitioner provided the First National Bank of Minneapolis (the bank) with a financial statement indicating that he had a net worth of $567,000. On June 24, 1981, the petitioner filed a Master Card application with Winters National Bank and Trust Co. On such application, the petitioner listed his "net earnings" as $65,000 per year from three employers: Raven, Bauer Farms, and Jato Assisted. His home address and the addresses of Bauer Farms and Jato Assisted were the same. The petitioner also stated that he had income of $85,000 per year from tax-free bonds. Attached to such application was a personal balance sheet. Such balance sheet was typed and contained numerous categories and subcategories of assets and liabilities which showed the net worth of the petitioner was $956,500. Accompanying the application was a letter from "Roger H. Boso, PUBLIC ACCOUNTANT" stating that the balance sheet was prepared from unverified information provided by *190 the petitioner and that the petitioner omitted "substantially all of the disclosures required by generally accepted accounting principals." The petitioner was arrested by Drug Enforcement Administration agents in Minneapolis, Minnesota, in January 1983. At the time, he was carrying a brief case which contained false identification, a large amount of currency, and other evidence which indicated to the IRS that he might be leaving the country and that the collection of taxes would be in jeopardy. Thereafter, a jeopardy assessment was made under section 6861. The petitioner was indicted for conspiracy to import and possess with intent to distribute a large quantity of marijuana. He was found not guilty by a jury. In the notice of deficiency issued to the petitioner, the Commissioner based his determinations upon the net worth method of reconstruction of income. The Commissioner's income computations, including adjustments made before trial, are summarized below: 1977
1978
1979
1980
Total Assets
$16,036.08
$63,708.79
$54,504.72
$189,594.82
Less: Total
Liabilities
9,335.79
51,996.49
24,981.50
13,349.69
Net Worth
6,700.29
11,712.30
29,523.22
176,245.13
Less: Prior Net Worth
6,700.29
11,712.30
29,523.22
Increase in Net Worth
5,012.01
17,810.92
146,721.91
Add: Other Net
Adjustments to
Net Worth
26,427.56
17,173.17
26,633.97
Adjusted Gross Income
31,439.57
34,984.09
173,355.88
Less: Itemized
Deductions
5,603.00
8,638.61
2,155.00
Taxable Income
25,836.57
26,345.48
171,200.88
Less: Reported Income
14,882.00
10,490.00
7,268.00
Unreported Taxable
Income
10,954.57
15,855.48
163,932.88
*191 Such total assets did not include the property the petitioner shipped from the Philippines to the United States or a 1969 Chevrolet Camaro. Such assets included the airplane and certain parts and alterations to it and the one-half interest in the boat. The petitioner had a series of loans with the bank which the Commisioner did not include as liabilities in his computations. The year-end balances of such loans were $2,000 for 1977, $0 for 1978, $20,000 for 1979, and $13,000 for 1980. OPINION The first issue for decision is whether the petitioner understated his taxable income for each of the years 1978, 1979, and 1980 in the amounts determined by the net worth method of reconstruction of income. The Commissioner may prove the existence and amount of unreported income by any method that will, in his opinion, clearly reflect the taxpayer's income. Sec. 446(b); see Holland v. United States,348 U.S. 121, 130-132 (1954); Campbell v. Guetersloh,287 F.2d 878, 880 (5th Cir. 1961); Davis v. Commissioner,239 F.2d 187, 189 (7th Cir. 1956), affg. a Memorandum Opinion of this Court. The use of the net worth method has long been an acceptable method of proving income. Holland v. United States,348 U.S. at 131; *192 Cefalu v. Commissioner,276 F.2d 122 (5th Cir. 1960), affg. a Memorandum Opinion of this Court; Davis v. Commissioner,supra;Lipsitz v. Commissioner,21 T.C. 917 (1954), affd. 220 F.2d 871 (4th Cir. 1955). A presumption of correctness attaches to the Commissioner's determination, and the taxpayer bears the burden of overcoming such presumption and proving that the determination is erroneous. Rule 142(a), Tax Court Rules of Practice and Procedure[7]; Cracchiola v. Commissioner,643 F.2d 1383, 1385 (9th Cir. 1981), affg. per curiam a Memorandum Opinion of this Court; Marcello v. Commissioner,380 F.2d 494 (5th Cir. 1967), affg. on this issue a Memorandum Opinion of this Court; Harper v. Commissioner,54 T.C. 1121, 1129 (1970). Generally, errors in the Commissioner's net worth computation do not destroy such presumption and do not shift the burden of going forward with the evidence to the Commissioner. George v. Commissioner,338 F.2d 221, 223 (1st Cir. 1964), affg. on this issue a Memorandum Opinion of this Court; Banks v. Commissioner,322 F.2d 530, 547-548 (8th Cir. 1963), affg. on this issue a Memorandum Opinion of this Court; Hoffman v. Commissioner,298 F.2d 784, 788 (3d Cir. 1962), *193 affg. on this issue a Memorandum Opinion of this Court; Anderson v. Commissioner,250 F.2d 242, 246 (5th Cir. 1957), affg. a Memorandum Opinion of this Court. The petitioner argues that his 1978 opening net worth was understated by $10,200. In support of this contention, the petitioner produced evidence, and we have found as a fact, that in 1978 and 1979 Mr. Weiss, for a 10-percent commission, sold $8,000 worth of personal property that the petitioner acquired while in the Navy. Additionally, the petitioner produced his application for employment by May, dated June 29, 1976, on which he stated he owned a 1969 Chevrolet Camaro. He testified that such Camaro was sold for $2,000 in 1978 or 1979. [8] *194 None of these assets appeared in the Commissioner's computations. The Commissioner argues that receiving $2,000 from the sale of a 10-year old car, particularly a Camaro, attacks common sense. We find the petitioner's testimony concerning the Camaro credible. Therefore, the petitioner's opening net worth will be increased by $9,200. The petitioner's next argument is that certain loans for which the petitioner was liable were not taken into consideration by the Commissioner. He notes that in 1979 he had outstanding loans with the bank in the amount of $20,000, that such loans were repaid in 1980, that the bank made $13,000 in loans to him in 1980, and that the 1980 loans were repaid in 1981. Because such loans do not appear in the Commissioner's computations, the petitioner contends that his net worth should be decreased by the amount of these liabilities. The Commissioner argues that the proper inquiry is how did the petitioner's liabilities change from year to year. He contends that the petitioner's net worth increased as the borrowed funds were repaid. We agree with the petitioner that the loans represent liabilities which the Commissioner failed to take into account in his net worth computations. Additionally, the Commissioner is correct when he states that annual changes in the petitioner's loan balance are the proper focus of inquiry; but to reflect those changes, the year-end liabilities should *195 be included in the computations, and the numbers he proposes in his reply brief are wrong. The year-end balances of such loans were $2,000 for 1977, $0 for 1978, $20,000 for 1979, and $13,000 for 1980. Such balances should be added to the petitioner's liabilities for the net worth computations. The petitioner charges that the Commissioner erroneously determined that he owned certain assets. The petitioner contends that he did not own the airplane. In support of this contention, he states that all relevant documents concerning the airplane refer to Raven as its owner. Furthermore, the petitioner notes that Mr. Oseran testified that the petitioner, in his dealings with DMI, identified himself as a representative of Raven and that, by the time of trial, DMI had registered title to the airplane in its name. Finally, the petitioner points out that both the petitioner and Mr. Shehan testified that, with respect to the airplane, the petitioner was acting on behalf of Mr. Smith who controlled Raven. The Commissioner argues that Mr. Oseran's testimony should be discounted because he never really knew if Raven existed. Additionally, the Commissioner states that Mr. Oseran's failure to *196 bring a copy of the title document to Court indicates that title to the airplane does not rest with DMI. Finally, the Commissioner says that the evidence shows that the petitioner was the only person who ever represented Raven and has not satisfactorily explained who controlled Raven. Regarding ownership of the boat, the petitioner argues that Mr. Smith was the true owner of the interest in question and that the petitioner was merely a "straw man." [9] The petitioner says that the use of a straw man was intended to hide the true identity of the buyer, Mr. Smith, a wealthy man, thereby preventing inflated purchase prices. The petitioner contends that, after a time, the title to the boat was transferred out of his name. The petitioner has failed to meet his burden of proof. Other than the signature of Mr. Chambers as incorporator of Raven on an aircraft registration application, the petitioner presented no documentary *197 evidence as to who controlled Raven. Additionally, there is little evidence that Raven ever existed; no incorporation documents were presented as evidence, and Mr. Chambers did not give evidence. It is noteworthy that Mr. Chambers purportedly acted as an escrow agent for Raven in May 1980 and as one of its incorporators in July 1980. These positions seem mutually exclusive and raise questions concerning his true role at Raven. In view of the ownership-like control exercised by the petitioner over the airplane, his uncorroborated representations to others and his statements in Court are not sufficient to meet his burden of proof. Similarly, with respect to the boat, the petitioner has not provided corroboration for his story. No document purporting to transfer title from the petitioner to Mr. Smith is in evidence. The only support for his story is Mr. Shehan's testimony that the petitioner told him that the boat was in his name and he wanted it transferred out. In view of the value of the asset and the lack of documentation or testimony from a non-party witness with personal knowledge indicating that the petitioner was merely a straw man, the petitioner's story is not sufficient *198 to meet his burden of proof. Accordingly, we sustain the Commissioner's determination with respect to the petitioner's ownership of the airplane and interest in the boat. The second issue for decision is whether the petitioner is liable for additions to tax for fraud for each of the years 1978, 1979, and 1980. Section 6653(b) provides that if any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. The Commissioner bears the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Levinson v. United States,496 F.2d 651, 654-655 (3d Cir. 1974); Miller v. Commissioner,51 T.C. 915, 918 (1969). To establish fraud, the Commissioner must show that the taxpayer intended to evade taxes which he knew or believed that he owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Webb v. Commissioner,394 F.2d 366, 377-378 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Powell v. Granquist,252 F.2d 56, 60 (9th Cir. 1958); Acker v. Commissioner,26 T.C. 107, 111-112 (1956). The presence or absence of *199 fraud is a factual question to be determined by an examination of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970). However, fraud may be proved by circumstantial evidence since direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct can often be relied on to establish the requisite fraudulent intent. Stone v. Commissioner56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). Based on the record as a whole, we conclude that the Commissioner failed to meet his burden. After modifications resulting from conclusions in this opinion, the amount of unreported income, if any, for 1978 and 1979 is relatively small, and the amount of unreported income for 1980 is quite large. Therefore, there is no clear pattern of attempted concealment of income. In addition, our conclusions regarding the petitioner's ownership of the airplane and the boat, which account for the overwhelming majority of the petitioner's 1980 deficiency, were based on the petitioner's failure *200 to meet his burden of proof, not on evidence produced by the Commissioner. In fact, the Commissioner provided no affirmative evidence to rebut the petitioner's contention that, in his dealings regarding the airplane and the boat, he was a representative of Mr. Smith. Throughout the case, the Commissioner suggested that the petitioner was engaged in the drug business and was receiving unreported income from that business, but the Commissioner utterly failed to prove that the petitioner was engaged in such business. Finally, the fact that the petitioner was securing funds through bank loans is some evidence that he needed money and that he was not receiving unreported income. The Commissioner argues that the essential factor regarding the petitioner's fraudulent intent is that he was financially astute and was in direct control of his financial affairs. For this argument, the Commissioner apparently assumes that the petitioner's 1980 and 1981 financial statements are accurate, and the Commissioner argues that such statements show that the petitioner possessed substantial assets, that he was fully aware of his assets, but that he concealed them from the Commissioner. We cannot explain *201 such financial statements, but the Commissioner has failed to demonstrate that any of the information contained therein is accurate or that the petitioner had a consistent source of income which he did not report. Therefore, the Commissioner's argument, without more, is not sufficient to prove fraud, and we hold that the petitioner is not liable for the addition to tax for fraud. The final issue for decision is whether the petitioner is liable under section 6654 for the addition to tax for underpayment of estimated tax for 1980. The imposition of this addition to tax is mandatory, unless the petitioner can bring himself within one of the exceptions of this section. Mitchell v. Commissioner,51 T.C. 641, 648 (1969), revd. 430 F.2d 1 (5th Cir. 1970), revd. 403 U.S. 190 (1971); Estate of Ruben v. Commissioner,33 T.C. 1071, 1072 (1960). Since the petitioner has made no effort to introduce evidence to disprove the Commissioner's determination on this issue, we sustain the addition to tax in an amount to be determined in light of our conclusions regarding the first issue in this case. Sec. 6654(a); Reaver v. Commissioner,42 T.C. 72, 83 (1964). Decision will be entered under Rule *202 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.↩
2. At trial, Mr. Shehan spelled his last name "S-H-E-H-A-N." On brief, both parties refer to him as "Mr. Sheehan." Since neither party requested a correction of the trial transcript, we adopt the spelling Mr. Shehan provided at trial. ↩
3. We have found that such motorcycles were assets of the petitioner despite minor discrepancies in the descriptions of such motorcycles provided by witnesses. ↩
4. Due to the length of his time overseas, the items brought back by the petitioner were not taxed.↩
5. At the time of trial, DMI Aviation was the successor organization to Dross Metals, Incorporated. For convenience, DMI refers to whichever organization is appropriate.↩
6. The C-119, named the "flying boxcar," is a large twin-engine cargo plane built for the military during the early 1950s.↩
7. Any reference to a Rule is to the Tax Court Rules of Practice and Procedure.↩
8. The value of the assets claimed by the petitioner is $9,200, while the increase in net worth claimed by the petitioner is $10,200. The petitioner provides no explanation for this discrepancy.
9. A straw man is only a nominal party to a transaction; he acts as an agent for another for the purpose of taking title to property and executing whatever documents and instruments the principal may direct respecting the property. Black's Law Dictionary 1274 (5th ed. 1979).↩